18-1124(L)
*Kilgour v. United States Securities and Exchange Commission*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2018

(Argued: January 22, 2019     Decided: November 8, 2019)

Docket Nos. 18-1124, 18-1127

───────────────────

COLIN KILGOUR, DANIEL WILLIAMS, JOHN DOE
*Petitioners*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,
*Respondent*.

───────────────────

Before:     KEARSE, SACK, LIVINGSTON, *Circuit Judges*.

These two petitions—one by John Doe, the other by Colin Kilgour and

Daniel Williams—are from the denial by the United States Securities and

Exchange Commission of "whistleblower" awards.  The petitioners sought the

awards following a $50 million settlement the SEC reached with Deutsche Bank

AG that resolved an enforcement action against the bank.  The petitioners assert

that the SEC erred in basing the denials of their claims on its determination that

the petitioners did not provide "original information that led to a successful

enforcement action," a prerequisite for obtaining a whistleblower award under the Securities Exchange Act and the SEC's regulations implementing the Act; and that the SEC erred procedurally during its decision-making process. We disagree. The petitions are therefore DENIED.

COLIN KILGOUR, Toronto, Ontario, Canada, *Pro se Petitioner.*

Daniel Williams, Toronto, Ontario, Canada, *Pro se Petitioner.*

DAVID E. KOVEL, Kirby McInerney LLP, New York, NY, for John Doe, *Petitioner.*

WILLIAM K SHIREY (Robert B. Stebbins, Stephen Yoder, Michael A. Conley, *on the brief*), for the United States Securities and Exchange Commission, Washington, D.C., *Respondent.*

SACK, *Circuit Judge*:

In 2015, the United States Securities and Exchange Commission (the "SEC") reached a settlement agreement with Deutsche Bank AG ("DB") after the SEC discovered misstatements in DB's financial statements. Previously, between 2010 and 2014, while the SEC was investigating DB, petitioners "John Doe,"[1] Colin Kilgour, and Daniel Williams disclosed information to the SEC that they thought

---

[1] We have adopted the parties' practice of keeping John Doe and two other claimants' identities confidential.

2

would be helpful to that investigation.  After the settlement, the petitioners filed applications with the SEC for "whistleblower" awards.  Their applications were denied.

The petitioners ask that we set aside the SEC's denial of their award applications and instruct the SEC to issue whistleblower awards to them based on the value of the information provided to the SEC.   For the reasons that follow, we deny the petitions.

## BACKGROUND

**I.      The Deutsche Bank Case and Settlement**

During 2005 and 2006, DB purchased $98 billion of leveraged super senior tranches in more than thirty collateralized debt obligations (the "LSS") as credit protection.  The LSS were leveraged eleven times, i.e., the sellers of the protection posted only 9% of the total value of the LSS as collateral.  In late 2008 and early 2009, DB began overvaluing the LSS by misstating in their financial records the associated "gap risk"—the risk that the market value of its credit protection could exceed the available collateral posted by the sellers.  This overvaluation was reflected in misstatements in DB's financial statements.  On May 26, 2015, the SEC both instituted agency cease-and-desist proceedings against DB with respect

3

to these statements and accepted a settlement offer from DB in which DB agreed to pay a penalty of $55 million.

## II. The Investigation

Between 2010 and 2014, i.e., before the SEC cease-and-desist proceedings were instituted, the SEC obtained information from several persons (the "Claimants") regarding the potential wrongdoing by DB. Three of the Claimants—John Doe, Colin Kilgour, and Daniel Williams – are the petitioners in this case.[2]

### a. John Doe

On or about June 7, 2010, the Enforcement Division of the SEC received information from DB's counsel, after Claimant 1, a DB employee, filed an internal complaint, to the effect that DB was overstating the value of certain assets "to improve the appearance of [DB's] financial performance" to its shareholders, the market and the investing public. Declaration of Amy Friedman, Assistant Director of the SEC Enforcement Division, July 27, 2016 ("Friedman Declaration"), at 3-4; Joint Appendix ("JA") 3086-87. Following this disclosure, the SEC opened an investigation of DB, and arranged for an in-person interview

---

[2] In this opinion, we refer to Claimants 1, 2, and 3. In doing so, we refer to persons other than John Doe, Colin Kilgour, and Daniel Williams.

with Claimant 1. According to the SEC, it was Claimant 1's "early identification of the Gap Risk issue that led the enforcement staff to focus on [that] issue in its investigation, and it was [that] issue that formed the cornerstone of the charges ultimately brought by the [SEC] against [DB] in the enforcement action." *Id.* at 3; JA 3087.

On September 30, 2010, petitioner John Doe met with enforcement staff from the SEC's Complex Financial Instruments Unit ("CFIU"), a group that was part of the SEC's Enforcement Division but whose membership did not overlap with the team working on the DB matter ("DB team"). The SEC and Doe offer different characterizations of this meeting. According to a declaration provided by the Deputy Chief of the CFIU, Reed Muoio: "[Doe] appeared to be very disjointed and had difficulty articulating credible and coherent information concerning any potential violation of the federal securities laws . . . . [He] brought with [him] to the meeting a wet brown bag containing what [he] claimed to be evidence." Declaration of Reid Muoio, Deputy Chief of CFIU, July 11, 2017 ("Muoio Declaration"), at 1; JA 4059.

Doe, for his part, contends that he provided credible, helpful information. For example, he asserts that during his meeting with the CFIU he gave a

presentation that explained how certain restructuring efforts by DB would reshape the gap risk of the LSS.  Doe sent several follow-up emails to the CFIU staff in October 2010, but Deputy Chief Muoio and his staff had concluded that Doe was "not a credible source of information." *Id.*  Having so concluded, Muoio and his staff declined to forward emails they received from Doe to other staff in the Division of Enforcement.  *Id*.  Meanwhile, the SEC assigned two TCR[3] numbers (numbers used to track whistleblower tips in its database) to Doe.

In March 2011, Claimant 2 began providing the DB team with information concerning DB's gap risk calculations and made multiple submissions to the team in June and July 2011.  The DB team found Claimant 2 to be a highly credible source of information, and the information that Claimant 2 provided proved, according to SEC enforcement officials, to be invaluable to their investigation of DB.

On July 29, 2011, Doe sent another email to the CFIU staff, which they forwarded to the DB team on August 3, 2011.  This was the first time the DB team had seen any information provided by Doe.  However, Doe's email contained "no

---

[3] "TCR" stands for "Tip, Complaint or Referral."  *See* United States Securities and Exchange Commission, Form TCR (Aug. 2011), https://www.sec.gov/files/formtcr.pdf.

6

new information and did not help advance the [DB] [i]nvestigation."  Friedman Declaration, at 8; JA 3092.

In November 2011 and December 2012, Claimant 2 made two additional submissions which were both considered by SEC enforcement personnel to be helpful to the DB team.  The submissions provided information about how the gap risk calculation affected DB's results on their late 2008 and early 2009 financial statements, and how something called the "Montreal Accord" affected the gap risk calculation.  At that point, the DB team had received no such information from Doe.

On March 11, 2013, Doe made additional submissions to the DB team, including the email message that he had sent to the CFIU staff back in October 2010.  But the DB team considered those submissions, like Doe's prior submissions, to be unhelpful.  At that point, "the investigation had already been ongoing for over two and a half years," and the information contained in Doe's submission was "largely duplicative of other information that [the DB team] had already received or had learned."  Friedman Declaration at 8; JA 3092.  Doe's re-sent October 2010 email, while referencing the Montreal Accord, "provided very little detail" and attached only "publicly-available documents."  Additional

7

Declaration of Amy Friedman, July 11, 2017 ("Add'l Friedman Declaration"), at 7;

JA 3827.

On April 26, 2013, Doe's counsel contacted the DB team to inform them

that Doe "had [additional] information that might aid" the investigation.  Add'l

Friedman Declaration, at 13; JA 3833.  The DB team met with Doe but found the

information to be redundant.  The DB team, like the CFIU in September 2010,

thought Doe's presentation was "very difficult to follow, as [he] jumped from

topic to topic."  *Id*. at 7.

On June 7, 2013, Doe made his final submission, attaching various internal

DB documents.  Again, these documents were considered by the DB team to be

largely duplicative of documents the DB team had received from Claimant 2 or

from DB itself when it responded to SEC document requests, and therefore

unhelpful.

     b.  <u>Colin Kilgour and Daniel Williams</u>

On June 21, 2013, Claimant 2 submitted an expert report to the DB team,

which had been prepared by the Kilgour Williams Group ("KWG"), a consulting

firm owned by petitioners Colin Kilgour and Daniel Williams.  According to the

DB team, this expert report was "detailed and comprehensive," "absolutely

critical to [the] investigation," and used "in connection with [the] proffer session with [DB] and ensuing settlement negotiations with the company." *Id.* at 9-10. After submitting the report, and until July 2014, KWG continued to provide information to the SEC and to respond to questions from the DB team that "allowed the [team] to strengthen the SEC's position vis-à-vis [DB]." *Id.*

In May 2014, Claimant 2 and his wife divorced. The state court overseeing the divorce proceedings awarded half the proceeds of any whistleblower payout Claimant 2 might receive to his wife. The court also ordered that Claimant 2 pay "all costs and expenses he had incurred or will incur with . . . [KWG]." State Court Divorce Judgment August 10, 2015, at 10; JA 411.

On August 11, 2014, Claimant 2 authorized Kilgour and Williams to make an independent whistleblower submission so that they too could claim an award from the SEC. The next day, they jointly submitted an SEC Form TCR in an attempt to attain whistleblower status. This Form TCR did not provide any new information; it reiterated the information that KWG had been commissioned to provide on behalf of Claimant 2 between June 2013 and July 2014 and which had previously been supplied to the SEC.

**III.    SEC Whistleblower Proceedings and the Award Order**

After DB agreed to pay the $55 million civil fine to the SEC, nine whistleblower claimants (including the three petitioners in the case at bar) came forward to claim awards.  On July 27, 2016, the SEC's Claims Review Staff ("CRS") issued a Preliminary Determination ("PD"), as is required by Rule 21F-10(d), recommending awards for Claimants 1 and 2 and rejecting all other claimants' applications.

Pursuant to SEC regulations, any claimant may submit "a written response to the Office of the Whistleblower setting forth the grounds for [an] objection to either the denial of an award or the proposed amount of an award."  Rule 21F-10(e).  To facilitate such objections, the SEC also permits claimants to request to review the materials "that formed the basis of the . . . [PD]."  Rule 21F-10(e)(1)(i).

After the issuance of the PD, Doe requested that the CRS produce all materials upon which it based its PD.  The CRS produced a record consisting of Doe's own submissions to the SEC and the Friedman Declaration, dated July 27, 2016.  The declaration set forth the timing of the CFIU intake and subsequent forwarding of Doe's information to the DB team, asserting that by the time the DB investigators received Doe's information, it was duplicative of information

that was publicly available or that they had already received from other sources (primarily Claimant 2).

Doe objected to the PD on several grounds, arguing that the CFIU staff should have forwarded his information to the DB investigators and that it was unfair for the SEC to penalize him for their failure to do so; that the CRS should have provided Doe with the other Claimants' materials on which Friedman had relied in preparing her declaration; and that Doe had, in any event, submitted important, original information, and therefore deserved credit as a source of that information. The SEC responded with the Muoio Declaration and a second declaration from Friedman.

On November 30, 2017, the SEC issued an "Order Determining Whistleblower Award Claims" for the DB matter. SPA 1. Under the order, Claimant 1 and Claimant 2 were each to receive an award of about $8 million. Each of the other claimants — including these petitioners — would not receive an award.

With respect to Doe's application, the SEC determined that "the information provided by [Doe] was not of a higher quality than the information provided by Claimant #2 (or Claimant #1)" and that "the [DB team] received

11

information from Claimant 2 (as well as Claimant 1) before receiving any information from [Doe]." SEC Order, November 30, 2017, SPA 16. The SEC therefore concluded that "the record firmly demonstrates that [Doe] did not provide information that led to the success of the [DB action]." *Id.*

Regarding Kilgour's and Williams's claim, the SEC found, *inter alia*, that the information the two had included in their August 2014 Form TCR was not "original information" because the SEC already had obtained it from Claimant 2 in his submissions. The SEC further decided that neither petitioner qualified as the "original source" of that information because they had both previously interacted with the SEC in their capacity as Claimant 2's experts. The SEC also determined that Kilgour's and Williams's Form TCR submission did not lead to the success of the enforcement action.

**DISCUSSION**

The petitioners Doe, Kilgour, and Williams now ask us to overturn the SEC's denials of their "whistleblower"[4] award applications. We must address

---

[4] The Securities Exchange Act provides, in relevant part:

> The term "whistleblower" means any individual, or 2 or more individuals acting jointly, who provides information relating to a violation of this Act

four issues in order to resolve the petitions: First, whether the SEC can, should, or must be equitably estopped from denying Doe his requested whistleblower award. Second, whether the SEC violated Doe's Due Process rights by failing to provide him with materials to which he asserts he was entitled in order to contest the CRS's PD. Third, whether the SEC acted arbitrarily and capriciously in granting an award to Claimant 2, but not Doe. And fourth, whether Kilgour and Williams were entitled to a whistleblower award for the information that they submitted.

## I. Standard of Review

We review the Commission's whistleblower award determinations "in accordance with section 706 of [the Administrative Procedure Act]." 15 U.S.C. § 78u-6(f). Accordingly, this Court may set aside an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," or if it is "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A) & (E). Section 702(2)(A) provides for "a deferential standard of review" where "we cannot substitute our judgment for that of the agency." *Nat. Res. Def. Council, Inc.*

---

to the Commission, in a manner established by rule or regulation by the Commission.

15 U.S.C. § 78u-6(a)(6).

*v. FAA*, 564 F.3d 549, 555 (2d Cir. 2009).  In reviewing the SEC's findings of fact for "substantial evidence" we require that they be supported by "more than a scintilla of evidence," which may be "less than a preponderance."  *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999).

**II.     Legal Framework**

In 2010, as part of the Dodd-Frank Act, Congress amended the Securities Exchange Act of 1934 to establish a whistleblower award program.  *See* 15 U.S.C. § 78u-6.  Under this program, the SEC "shall pay an award or awards to 1 or more whistleblowers who voluntarily provided original information to the Commission that led to the successful enforcement of [a] covered judicial or administrative action."  *Id.* § 78u-6(b)(1).  To be eligible for an award, a whistleblower must submit information in accordance with the SEC's rules and regulations.  *Id.* § 78u-6(a)(6), (c)(2)(D); *see also id.* § 78u-6(j) (authorizing the SEC to issue rules and regulations to implement the program).

In 2011, the SEC adopted rules establishing the procedures and criteria for whistleblower awards.  *See* Securities Whistleblower Incentives and Protections, 76 Fed. Reg. 34,300 (June 13, 2011) (codified at 17 C.F.R. Parts 240 and 249).  These rules limit awards to whistleblowers who "voluntarily provide the

Commission with original information that leads to the successful enforcement by the Commission of a Federal court or administrative action."  17 C.F.R. § 240.21F-3(a).

"Original information" is defined as information "[n]ot already known to the Commission from any other source, unless [the applicant is] the original source of the information."  17 C.F.R. § 240.21F-4(b)(1)(ii).  The SEC considers an applicant to be an "original source" of information that the SEC has obtained from another source if "the other source obtained the information from [the applicant or her] representative."  *Id.* § 240.21F-4(b)(5).  The rules further define information "lead[ing] to successful enforcement" as information that (1) "was sufficiently  specific, credible, and timely to cause" the SEC to open, reopen, or expand an examination or investigation, leading to a "successful judicial or administrative action based in whole or in part on conduct that was the subject of [the applicant's] original information," or (2) concerned "conduct that was already under examination or investigation" and its "submission significantly contributed to the success of the action."  *Id.* § 240.21F-4(c)(1)-(2).  "A whistleblower must be an individual.  A company or another entity is not eligible to be a whistleblower."  *Id.* § 240.21F-2(a)(1).

Rule 21F-9 governs the procedures for submitting information as the basis of a claim for a whistleblower award. 17 C.F.R. § 240.21F-9; *see also id.* § 240.21F-2(a)(2) (eligibility for awards conditioned on compliance with these procedures, among others). It provides that to be considered a whistleblower for these purposes, an individual must submit her or his information to the SEC through the SEC's website or in a "Form TCR (Tip, Complaint or Referral)" mailed or faxed to the SEC. *Id.* § 240.21F-9(a). This submission must be accompanied by a declaration "under penalty of perjury . . . that [the] information [provided] is true and correct to the best of [the claimant's] knowledge and belief." *Id.* § 240.21F-9(b). "[T]he Commission may, in its sole discretion, waive any of these procedures based upon a showing of extraordinary circumstances." *Id.* § 240.21F4-8(a).

### III. Can the SEC Be Equitably Estopped from Denying Doe's Whistleblower Award?

Doe does not contest the SEC's factual determination that when the DB team received his submissions, the information was duplicative of information the team had already obtained from other sources. Doe argues, though, that "the Commission should be equitably estopped from claiming it did not rely on Doe's September/October 2010 submissions and be directed to issue an award based on

the contribution that information made to their investigation (when provided by other sources)." Pet'r Doe Br. 33. In other words: Doe argues that notwithstanding the fact that his *submissions* did not contribute to the success of the enforcement action against DB, he should be entitled to a whistleblower award because the *information* in those submissions did. We disagree.

In *Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990), the Supreme Court concluded that "a claimant may not assert a monetary claim of estoppel against the government when the funds used to pay this claim will come from the Federal Treasury, but are not authorized by statute." *Dun & Bradstreet Corp. Found. v. U.S. Postal Serv.*, 946 F.2d 189, 195 (2d Cir. 1991) (citing *Office of Personnel Management v. Richmond*, 496 U.S. at 423-25.). "Accordingly, an estoppel claim that will require the payment of government funds in contravention of a statute will fail." *Id.* This is such a claim.

First, the funds for the award that Doe requests would come from the Securities and Exchange Commission Investor Protection Fund in the Federal Treasury, as do all SEC whistleblower awards. *See* 15 U.S.C. § 78u-6(g)(1) ("There is established in the Treasury of the United States a fund to be known as the 'Securities and Exchange Commission Investor Protection Fund'").

17

Second, if we were to grant Doe's petition on the grounds of equitable estoppel, we would be compelling the SEC, in effect, to issue Doe an award that is not authorized by statute. In his reply brief, Doe argues that awarding him whistleblower funds would not contravene the Securities Exchange Act because the relief sought—granting Doe's award application—is authorized by statute. He contends that "[i]n crediting the provider of the original information the statute . . . requires that the SEC '*shall* pay' for 'original information' that led to a successful conclusion." Pet'r Doe Reply 11. Doe argues that therefore, "so long as a claimant provided original information, and that information aided a successful enforcement action, payment is authorized and non-discretionary." *Id.* Not so.

We do not decide whether that the SEC erred in its determination that Doe was not credible. As the SEC notes, the "CFIU staff and the DB team reached generally similar conclusions that Doe did not have helpful information regarding Deutsche Bank." SEC Br. at 30. But even if we assume that some of the information Doe provided was also provided by Claimant 2 and ultimately led to the success of an enforcement action, the statute does not authorize the SEC to give Doe an award under the circumstances.

"When Congress has entrusted rulemaking authority under a statute to an administrative agency, we evaluate the agency's implementing regulations under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)." *Encarnacion ex rel. George v. Astrue*, 568 F.3d 72, 78 (2d Cir. 2009); *see also Stryker v. SEC*, 780 F.3d 163, 165 (2d. Cir. 2015) (applying the "familiar two-step framework set forth in *Chevron*" to review the SEC's denial of a whistleblower award where the ruling was based on rules promulgated by the SEC to implement the Dodd-Frank Act). "*Chevron* requires us to apply a two-step inquiry to an agency's interpretation of a statute. At the first step of the analysis, a reviewing court must ask whether Congress has directly spoken to the precise question at issue." *Cappetta v. Comm'r of Soc. Sec. Admin.*, 904 F.3d 158, 166 (2d Cir. 2018) (internal quotation marks omitted). "If the statute is ambiguous, then at the second step the question for the court is whether the agency's answer is based on a permissible construction of the statute . . . in other words, whether the agency's interpretation is reasonable." *Id.* (internal quotation marks omitted).

The Act provides that the Commission "shall pay an award" to a whistleblower "who voluntarily provided original information to the Commission that led to the successful enforcement of the covered judicial or

administrative action." 15 U.S.C. § 78u-6(b)(1). The statute thus seems to require that the information *as provided by the whistleblower* must have "led to the successful enforcement action." And, assuming *arguendo* that Dodd-Frank is ambiguous on this question, "we defer to the SEC's interpretation of Dodd-Frank at Step 2." *Stryker*, 780 F.3d at 166. The SEC has enacted Rule 240.21F-4(c), which clarifies what is meant by "information that leads to a successful enforcement." 17 C.F.R. § 240.21F-4(c). According to the Rule, a whistleblower satisfies this statutory command if he provides original information in a "submission" which itself "significantly contributed to the success of the action." *Id*. § 240.2F-4(c)(2). The SEC's answer, that it is a whistleblower's *submission* that must contribute to the successful action, is thus "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.

Applying *Chevron*, we conclude that the interpretation of "information . . . that led to" in 15 U.S.C § 78u-6(b)(1) by the SEC is reasonable. First, Congress has not "directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. Section 78u-6 says nothing about whether a whistleblower can be given an award if their submission was not used by the SEC to bring a successful enforcement action. Second, the SEC's answer—that it is a whistleblower's submission that

must contribute to the successful action—is "based on a permissible construction of the statute." *Id.* at 843.

Doe asks us to disregard the SEC's interpretation of "information . . . that led to," and instead declare that a whistleblower need not worry about curating a useful submission. All a whistleblower must do to be entitled to an award, Doe contends, is give some useful information to the SEC first, in any form, no matter how impenetrable. Consider an example: Whistleblower A submits to the SEC one-thousand pages of scrambled documents, informing the SEC only that some incriminating information lies within that might prove useful to an ongoing investigation. Several weeks later, Whistleblower B submits to the SEC a single incriminating document, 10 pages in length, and explains in an attached memorandum why the document is incriminating and useful to an ongoing investigation. The SEC uses Whistleblower B's submission, and the ongoing investigation ultimately concludes in a successful enforcement action. According to Doe's interpretation, it would seem, as long as Whistleblower A's submission contained the information passed along by Whistleblower B, Whistleblower A is entitled to an award. We disagree.

21

The interpretation that Doe asks us to adopt misreads the statute and would lead to consequences not likely intended by Congress. The whistleblower program was enacted "to motivate people who know of securities law violations to tell the SEC." *Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 777 (2018) (internal quotation marks and emphasis omitted). "By enlisting whistleblowers to assist the Government [in] identify[ing] and prosecut[ing] persons who have violated securities laws, Congress undertook to improve SEC enforcement and facilitate the Commission's recover[y] [of] money for victims of financial fraud." *Id.* (internal quotation marks omitted; brackets in original).

As the foregoing example suggests, Doe's interpretation might disincentivize whistleblowers from curating their submissions. The SEC's interpretation, by contrast, strikes a sensible balance between care and timeliness, one that is more consistent with the whistleblower program's purpose: A whistleblower might still be rewarded for being the first to bring incriminating information to the SEC's attention, but only if that information is contained in a credible, and ultimately useful submission.

In sum, it was not arbitrary or capricious for the SEC to conclude that Doe's submissions did not provide "original information to the Commission that

led to" a successful enforcement action, 15 U.S.C. § 78u-6(b)(1), because Doe's *submissions* were not used by the DB team. The award Doe asks us to compel by equitable estoppel in this case is therefore not authorized by statute, and because that award would come from the Federal Treasury, *Office of Personnel Management* forecloses Doe's claim.

## IV. Did the SEC Violate Doe's Due Process Rights by Failing to Provide Doe with Certain Materials?

Doe next argues that the SEC violated his rights under the Due Process Clause of the Fifth Amendment by failing to provide him with materials that would have enabled him to contest the CRS's PD more effectively. Specifically, Doe argues that the SEC violated Rule 21F-12(a) by relying on materials submitted by Claimants 1 and 2 in determining Doe's whistleblower claim, and then not producing those materials to Doe. Pet'r Doe Br. 35. We disagree. We think Doe's argument is contrary to the plain meaning of the relevant regulations.

Rule 240.21F-10(e)(1)(i) requires the SEC to produce material requested by a claimant only if the materials "formed the basis of the Claims Review Staff's Preliminary Determination" on the claimant's application. 17 C.F.R. § 240.21F-10(e)(1)(i). Those "materials" may be (1) "publicly available materials from the

covered action or related action," (2) "the whistleblower's Form TCR . . . and other related materials provided by the whistleblower to assist the Commission with the investigation," (3) "the whistleblower's . . . award application [and supporting submissions]," and (4) "[s]worn declarations (including attachments) from the Commission staff regarding any matters relevant to the award determination."  *Id.* § 240.21F-12(a).  Crucially, claimants are "not entitle[d] . . . to obtain from the Commission any materials . . . other than those listed" in Rule 21F-12(a).  *Id.* § 21F-12(b).

Claimant 1's and 2's submissions are not included within the materials that Doe is entitled to review under Rule 21F-12(a).  The SEC therefore did not violate that rule or by extension Doe's Due Process rights in refusing to produce them.

**V.  Did the SEC Act in an Arbitrary and Capricious Manner by Favoring Claimant 2's Submissions over Doe's?**

Doe's final argument is that the SEC was "biased against Doe in its treatment of information that he provided versus similar information provided by Claimant 2."  Pet'r Doe Br. 38.  He therefore challenges the SEC's decision on the basis that its treatment of his submission was arbitrary and capricious.

We conclude to the contrary.  It was reasonable for the SEC to credit its staff's informed determination that Doe had not provided a credible submission,

and that Claimant 2 had provided consistent, critical information that led to the successful enforcement action against DB.

The CFIU staff explained that it had concluded, after interviewing Doe in 2010, that he "had difficulty articulating credible and coherent information concerning any potential violation of the federal securities laws." Muoio Declaration at 1; JA 4059. Doe "brought with him to the meeting a wet brown paper bag containing what he claimed to be evidence," and his "files were jumbled and disorganized. During the meeting he repeatedly referred to distress over [a] personal situation, and [he] appeared to be under great duress." *Id.* And when Doe was interviewed again in 2013, this time by the DB team, they found that he was "very difficult to follow, as he jumped from topic to topic." Add'l Friedman Declaration, at 13; JA 3833.

The SEC personnel decided that Claimant 2, by contrast, provided more critical or helpful information in a far more digestible manner than Doe. The DB team itself characterized Claimant 2's submission as "detailed and comprehensive" and concluded that it "far surpassed the quality of the information provided by [Doe]." Add'l Friedman Declaration, at 9; JA 3829. Doe purports to perceive some pernicious bias, asserting that Claimant 2 also

provided "publicly available" information—an aspect of Doe's submission that the SEC faulted him for—but the DB team explained that "Claimant 2's expert report was not based on publicly available information, but contained an inside view of . . . the Montreal Accord." *Id.* at 11. The SEC therefore acted in a manner that was reasonable, not arbitrary or capricious.

**VI. Were Kilgour and Williams entitled to a whistleblower award for the information that they submitted in their Form TCR?**

Kilgour and Williams argue that they are entitled to a whistleblower award on the basis of information they provided to the SEC in their joint Form TCR submitted in August 2014. We disagree.

As discussed above, Kilgour and Williams would be entitled to an award in return for that submission only if (1) they provided original information submitted in their Form TCR, and (2) their submission significantly contributed to the success of the action. *See* 17 C.F.R. §§ 240.21F-3(a), 240.21F-4(b)(1)(ii), (b)(5), (c)(2). But by the time they submitted their Form TCR, all the information contained therein was already known to the DB team, having been provided by Kilgour and Williams earlier to support Claimant 2's submissions. Accordingly, their Form TCR submission did not significantly contribute to the success of the DB action; Claimant 2's submissions did.

We recognize that Rule 21F-4, contains an "original source exception," which provides that

> The Commission will consider you to be an original source of the same information that we obtain from another source if the information satisfies the definition of original information and the other source obtained the information from you or your representative.

17 C.F.R § 240.21F-4(b)(5). Kilgour and Williams argue a that refusal to grant them that exception renders the original source exception "moot because it would effectively disqualify all whistleblowers, including petitioners Kilgour and Williams, from making [w]histleblower applications using original information attributed to them under this rule, because, by definition, the SEC was already aware of it." Pet'rs K&W Br. 28. We disagree: The SEC's interpretation of "information . . . that led to" in Rule 21F-4(c)(2)—discussed above—would not have the effect of nullifying the original-source definition in Rule 21F-4(b)(5).

Rule 21F-4(b)(7) advises a whistleblower that:

> [i]f you provide information to the Congress, any other authority of the Federal government, a state Attorney General or securities regulatory authority, any self-regulatory organization, or the Public Company Accounting Oversight Board, or to an entity's internal whistleblower, legal, or compliance procedures for

> reporting allegations of possible violations of law, and you, within 120 days, submit the same information to the Commission pursuant to § 240.21F-9 of this chapter, as you must do in order for you to be eligible to be considered for an award, then, for purposes of evaluating your claim to an award under §§ 240.21F-10 and 240.21F-11 of this chapter, the Commission will consider that you provided information as of the date of your original disclosure, report or submission to one of these other authorities or persons.

17 C.F.R. § 240.21F-4(b)(7). In other words, in circumstances identified in the Rule—such as when a person submits his or her tip to another federal agency— the SEC will treat the information as though it had been submitted to the SEC directly from that person at the same time that it was submitted to the other agency. This rule thus preserves the original source exception, notwithstanding the submission-focused nature of Rule 21F-4(c)(2), for certain specified situations. This case does not present such a situation.

## Conclusion

We have considered the petitioners' remaining arguments in support of their petitions and conclude that they are without merit. For the foregoing reasons, we DENY the petitions of Doe, Kilgour, and Williams to compel the SEC to grant their applications for whistleblower awards in connection with the DB matter.